UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE MD MANAGEMENT CO., LLC<br>    Petitioner<br><br>ADRIAN LEPEDEANU<br>    Beneficiary<br><br>MARIANA LEPEDEANU<br>    Dependent, Spouse<br><br>R.L.<br>    Dependent, Child<br><br>    Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, CITIZENSHIP AND<br>IMMIGRATION SERVICES,<br><br>    Defendant. | Civil Action No. 04-10499-RWL |

### DEFENDANT'S NOTICE OF FILING OF SUPPLEMENTAL ADMINISTRATIVE RECORD

Pursuant to the schedule set by the Court at the June 16, 2004 status hearing, Defendant hereby provides notice of filing of Supplemental Administrative Record in this matter, and attaches it hereto. It is numbered 0309-0319, and consists of the June 25, 2004 decision by the Administrative Appeals Office regarding the Plaintiffs in this matter. It is Defendant's understanding that the entire Administrative Record has now been filed with this Court.

Respectfully submitted,

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY

By its attorney,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Jeremy M. Sternberg

Jeremy M. Sternberg
Assistant U.S. Attorney
U. S. Attorney's Office
J. Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3142


Certificate of Service

I certify that I caused a copy of this notice of filing to be sent by US Mail to Maureen O'Sullivan, Kaplan, O'Sullivan & Friedman, 10 Winthrop Sq., Boston, MA 02110.

6/28/04

Jeremy M. Sternberg
Assistant U.S. Attorney

U.S. Department of Homeland Security
20 Mass, Rm. A3042, 425 I Street, N.W.
Washington, DC 20529



**U.S. Citizenship and Immigration Services**

THE M.D. MANAGEMENT CO., LLC
569 ATHERTON STREET
MILTON, MA 02816
LOS ANGELES, CA 90027

FILE:   EAC 02 247 52656   Office: VERMONT SERVICE CENTER   Date: JUN 25 2004

IN RE:   Petitioner: THE M.D. MANAGEMENT CO., LLC
         Beneficiary: ADRIAN E. LEPEDEANU

PETITION: Petition for a Nonimmigrant Worker Pursuant to Section 101(a)(H)(i)(b) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(H)(i)(b)

ON BEHALF OF PETITIONER:

S. CHRISTOPHER STOWE, JR.
20 CENTERVILLE ROAD
WARWICK, RI 02886

INSTRUCTIONS:

This is the decision of the Administrative Appeals Office in your case. All documents have been returned to the office that originally decided your case. Any further inquiry must be made to that office.

*Mari Johnson*

For Robert P. Wiemann, Director
Administrative Appeals Office

0309

www.uscis.gov

EAC 02 247 52656
Page 2

**DISCUSSION:** The Director, Vermont Service Center, revoked the approval of the nonimmigrant visa petition and the Administrative Appeals Office (AAO) dismissed a subsequent appeal on January 6, 2004. Pursuant to 8 C.F.R. § 103.5(a)(5)(ii), the AAO will reopen this proceeding on its own motion, for purposes of entering a new decision with additional clarification of the facts and law. The previous decision of the AAO shall be affirmed. The approval of the petition will be revoked.

In accordance with 8 C.F.R. § 103.5(a)(5)(ii), the AAO notice of reopening provided the petitioner a 30-day period in which to submit a brief. As of this date, nothing further has been submitted.

In accordance with the standard of review for motions to reconsider at 8 C.F.R. § 103.5(a)(3), the AAO reviewed the entire record, to determine whether the AAO's previous decision to dismiss the appeal was an incorrect application of law or Citizenship and Immigration Services (CIS) policy to the evidence of record at the time of the decision. Upon this review, the AAO has concluded that the AAO had correctly applied law and CIS policy in its decision to dismiss the appeal. Accordingly, the appeal will be dismissed, and the approval of the petition will be revoked.

The petitioner operates two McDonald's restaurant franchises. It has 95 employees, a gross annual income of $2,462,954, and seeks to employ the beneficiary as a food service manager at one of its franchises.

The service center issued an approval of the I-129 petition nonimmigrant visa petition on September 6, 2002. On September 22, 2002, however, the director of the service center served a Notice of Intent to Revoke (NOIR) upon the petitioner. The NOIR stated its factual basis as follows:

> It has now come to the attention of this Service that the position offered as food service manage[r] does not appear to qualify as a "specialty occupation" pursuant to section 101(a)(15)(H)(I)(b) [sic]. A review of the file indicates that previous employees in the same position consisted of the petitioner and/or his spouse. The petitioner has a bachelor's degree yet the other employee has an associate's degree. Accordingly, you have not submitted sufficient evidence to clearly indicate that the position requires the holder of at least a baccalaureate degree.

After reviewing the petitioner's response to the NOIR, the service center director revoked the approval of the petition by a decision dated December 23, 2002, which included this statement of the basis for the revocation: "This office is not persuaded that you have established that the position normally requires at least a baccalaureate degree or that the duties of the particular position are especially complex or unique."

On appeal, counsel submitted a brief and additional information. Counsel asserted that the proffered position qualifies as a specialty occupation and satisfies all criteria set forth in 8 C.F.R. § 214.2(h)(4)(iii)(A).

As should be evident in the following discussion, the service center director was correct in revoking approval of the petition and the AAO was correct in affirming the director's decision.

EAC 02 247 52656
Page 3

Section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act (the Act), 8 U.S.C. § 1101(a)(15)(H)(i)(b), provides, in part, for the classification of qualified nonimmigrant aliens who are coming temporarily to the United States to perform services in a specialty occupation.

Section 214(i)(l) of the Act, 8 U.S.C. § 1184(i)(l), defines the term "specialty occupation" as an occupation that requires:

> (A) theoretical and practical application of a body of highly specialized knowledge, and
>
> (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

The term "specialty occupation" is further defined at 8 C.F.R. § 214.2(h)(4)(ii) as:

> [A]n occupation which requires theoretical and practical application of a body of highly specialized knowledge in field of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.

Pursuant to 8 C.F.R. § 214.2(h)(4)(iii)(A), to qualify as a specialty occupation, the position must meet one of the following criteria:

> *(1)* A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position;
>
> *(2)* The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;
>
> *(3)* The employer normally requires a degree or its equivalent for the position; or
>
> *(4)* The nature of the specific duties is so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

The AAO does not simply rely on a position's title when determining whether a particular job qualifies as a specialty occupation. The specific duties of the offered position, combined with the nature of the petitioning entity's business operations, are factors that the AAO considers. The beneficiary's job responsibilities were detailed with the filing of the I-129 petition:

0311

EAC 02 247 52656
Page 4

Our company is exploring expansion through the acquisition of additional franchises. We are in need of the services of a Food Service Manager to coordinate the food service activities at each of our Boston, MA restaurants. This manager will report directly to [the Owner/CEO] ... [The beneficiary] will be responsible for supervising other shift managers, production managers, service managers and staff and have the following duties:

- Responsible for all operations and functions of the franchise;

- Estimate food and beverage costs, requisition and purchase product and supplies;

- Direct hiring, firing and assignment of personnel;

- Responsible for all training of personnel to maintain consistent level of quality and service;

- Investigate and resolve food quality and service complaints; and

- Review financial transactions and monitor budget to ensure efficient operation, and to ensure expenditures stay within budgetary limitations.

Subsequent to the filing of the I-129 petition, the director requested additional evidence. Specifically, the director requested proof that: a baccalaureate degree in a specific field of study is a standard minimum requirement for the offered position in the petitioner's company or industry; and the petitioner normally employed individuals with a baccalaureate degree in a specific field of study for the offered position.

In response to that request, the petitioner provided two advisory opinions. The first opinion was from Nicholas J. Hadgis, Dean of the School of Hospitality Management at Widener University of Chester, Pennsylvania, and is dated August 20, 2002. Dean Hadgis opined that the proffered position requires a baccalaureate degree (field of study unspecified) along with industry training and experience. The second opinion is dated August 19, 2002, and was prepared by John Stefanelli, Professor and Chair of the Department of Food and Beverage Management, William F. Harrah College of Hotel Administration, Las Vegas, Nevada. It was Professor Stefanelli's opinion that it was the preference of McDonald's, and other restaurant companies, to hire entry-level managers who possess four-year college degrees in hospitality and/or business.

In further response to the director's request for evidence, the petitioner noted that it had recruited for the offered position through newspaper classified ads in the Boston Globe and through Internet postings on its web site. The petitioner states that the Internet ad ran continuously for over 6 months, with no response. The petitioner also indicates in its August 27, 2002 response, that during the past two years the position had been filled by the CEO and his wife. The CEO holds a bachelor's degree in an unspecified discipline, and his wife holds an associate's degree in an unspecified discipline. Both have over ten years experience in the restaurant/hospitality industry.

As previously noted, the I-129 petition was approved on September 6, 2002. On September 20, 2002, the director issued a NOIR, noting that the subject position did not appear to qualify as a specialty occupation.

0312

EAC 02 247 52656
Page 5

Specifically, the director noted that the position had previously been performed by one individual with a bachelor's degree, and another with only an associate's degree.

Pursuant to applicable regulation, the petitioner was given 30 days to present evidence that would overcome the stated reasons for revocation.

In response to the NOIR, the petitioner asserted that the CEO's wife possessed an associate's degree, plus over 37 years of progressively responsible experience in the restaurant and hospitality industry, and that her degree and experience were equivalent to a bachelor's degree in food service management. The petitioner also listed three previous holders of the offered position that were no longer employed with the company, and stated that each possessed a bachelor's degree.

In further response, the petitioner stated that the duties of the offered position are so specialized and complex that knowledge required to perform them is usually associated with the attainment of a baccalaureate or higher degree. In support of that conclusion the petitioner submitted copies of reports that the beneficiary would be required to complete to establish franchise compliance with standards set by the McDonald's Corporation. The beneficiary would also be required to complete: periodic financial statements; a monthly profit and loss report; a product sales report; a daily store report; a sales ledger; an inventory reorder report; a supervisor audit worksheet deposit validation report; a product mix report; an inventory stat report; a QCR optimum food cost report; a raw waste report; a completed waste report; and a labor analysis report.

Supplemental opinion letters were also submitted from Dean Hadgis and Professor Stefanelli. Dean Hadgis again stated that the complexity of the proffered position required a minimum of a bachelor's degree in hotel/restaurant management, or a related field, as a minimum requirement for entry into the position. Professor Stefanelli stated that a bachelor's level education is necessary for the position offered. He further indicated, however, that while a four-year degree is preferred, many companies are forced to "underhire" for competitive reasons, and then further educate and/or train employees.

In revoking the I-129 approval, the director stated that the petitioner had failed to establish that the proffered position is a specialty occupation, i.e., that the position required a bachelor's degree or that the duties of the position were especially complex or unique.

On appeal, counsel asserted that the proffered position qualifies as a specialty occupation and satisfies all criteria set forth in 8 C.F.R. § 214.2(h)(4)(iii)(A).

CIS has long recognized the *Occupational Outlook Handbook* (*Handbook*), published by the Bureau of Labor Statistics, U.S. Department of Labor, as an authoritative source on the duties and educational requirements of a wide variety of occupations.

In the 2002-2003 edition of the *Handbook*, at 55-56, the duties of a food service manager are detailed:

> The daily responsibilities of many food service managers can often be as complicated as some of the meals prepared by a fine chef. In addition to the traditional duties of selecting and pricing menu items, using food and other supplies efficiently, and achieving quality in food preparation and service, managers now are responsible for a growing number of administrative and human resource tasks. For example, managers must carefully find and

0313

EAC 02 247 52656
Page 6

evaluate new ways of recruiting employees in a tight job market. Once hired, managers also must find creative ways to retain experienced workers.

In most restaurants and institutional food service facilities, the manager is assisted in these duties by one or more assistant managers, depending on the size and operating hours of the establishment. In most large establishments, as well as in many smaller ones, the management team consists of a general manager, one or more assistant managers, and an executive chef. . . . In fast-food restaurants and other food service facilities open for long hours – often 7 days a week – several assistant managers, each of whom supervises a shift of workers, aid the manager. . . .

. . .

On a daily basis, managers estimate food consumption, place orders with suppliers, and schedule the delivery of fresh food and beverages. They receive and check the content of deliveries, evaluating the quality of meats, poultry, fish, fruits, vegetables, and baked goods. To ensure good service, managers meet with sales representatives from restaurant suppliers to place orders replenishing stocks of tableware, linens, paper, cleaning supplies, cooking utensils, and furniture and fixtures. They also arrange for equipment maintenance and repairs, and coordinate a variety of services such as waste removal and pest control.

The quality of food dishes and services in restaurants depends largely on a manager's ability to interview, hire, and, when necessary, fire employees. This is especially true in tight labor markets, when many managers report difficulty in hiring experienced food and beverage preparation and service workers. . . . Once a new employee is hired, managers explain the establishment's policies and practices and oversee any necessary training. Managers also schedule the work hours of employees, making sure there are enough workers present to cover peak dining periods. If employees are unable to work, managers may have to fill in for them. Some managers regularly help with cooking, clearing of tables, or other tasks. . . . They also investigate and resolve customer's complaints about food quality or service. . . .

In addition to their regular duties, food service managers have a variety of administrative responsibilities. Although much of this work is delegated to a bookkeeper in a larger establishment, managers in most smaller establishments, such as fast-food restaurants, must keep records of the hours and wages of employees, prepare the payroll, and fill out paperwork in compliance with licensing laws and reporting requirements of tax, wage and hour, unemployment compensation, and Social Security laws. Managers also maintain records of supply and equipment purchases and ensure that accounts with suppliers are paid on a regular basis. . . .

. . .

At the conclusion of each day, or sometimes each shift, managers tally the cash and charge receipts received and balance them against the record of sales. In most cases, they are responsible for depositing the day's receipts at the bank or securing them in a safe place. . . .

0314

EAC 02 247 52656
Page 7

The duties of the offered position fall within the duties set forth above. It is understood that this particular position is responsible for the overall operation of a high volume business establishment, and that the beneficiary supervises other assistant managers and employees. Those duties are not, however, inconsistent with those listed in the *Handbook* for Food Service Managers.

The petitioner has not met any of the regulatory requirements to qualify the offered position as a specialty occupation. The *Handbook* notes that a bachelor's degree in restaurant and food service management provides strong preparation for a career in this occupation. Candidates are recruited, however, from two and four-year college hospitality management programs, as well as from technical institutes and other institutions offering programs leading to associate degrees or other formal certification. *Id.* at 56–57. Thus, the petitioner has not established the first criterion of 8 C.F.R. § 214.2(h)(4)(iii)(A), that a baccalaureate or higher degree, or its equivalent, is normally the minimum requirement for entry into the position. This finding is consistent with the opinion offered by Professor Stefanelli on October 10, 2002, wherein the professor acknowledged that many companies prefer baccalaureate level education, but that many hire individuals with lesser levels of education and then provide additional education, training, and/or experience.

The petitioner also failed to establish any of the remaining three criteria at 8 C.F.R. § 214.2(h)(4)(iii)(A):

First, it was not established that a degree requirement was common to the industry in parallel positions among similar organizations, or alternatively, that the position was so complex or unique that it can be performed only by an individual with a degree. None of the opinion letters presented offer convincing evidence that a degree requirement is standard in the industry. The letters offer the opinion of the learned writers, but no corroborating evidence is presented in support of those opinions. As noted above, those opinions are contradictory to the Department of Labor's findings noted in the *Handbook*. Furthermore, the duties offered to the beneficiary are common in the industry for food service managers, and are not unusually complex or unique. The AAO may, in its discretion, use as advisory opinions statements submitted as expert testimony. However, where an opinion is not in accord with other information or is in any way questionable, the AAO is not required to accept or may give less weight to that evidence. *Matter of Caron International*, 19 I&N Dec. 791 (Comm. 1988).

Second, the petitioner has not established that it normally requires a degree in a specific specialty, or its equivalent, for the position. The petitioner states that the position has been performed by the CEO and his wife in recent years, and that both have bachelor's degrees or the equivalent thereof. The record does not disclose the educational discipline of either degree holder. It is, therefore, impossible to determine whether either holds a degree in a related specialty. Furthermore, the record is not sufficient to determine that the CEO's wife possesses the equivalent of a bachelor's degree based upon her associate degree and work experience. The record does not reflect that her experience was gained while working with peers, supervisors, or subordinates who have a degree or its equivalent in the specialty occupation, or that she has recognition of expertise in the specialty. 8 C.F.R. § 214.2(h)(4)(iii)(D)(5). The petitioner did not submit evidence of the managers' educational backgrounds. A statement in an employee folder that an employee has a certain level of education in an unspecified discipline is not sufficient to establish that the employee had baccalaureate level education in a specific related specialty. Finally, there is the matter of the advertisements that the petitioner stated that it had placed on the Internet and in the *Boston Globe* for the proffered position. The AAO withdraws the statement in its earlier decision that the petitioner did not provide copies of those advertisements. The record contains an August 23, 2002 copy of an Internet advertisement for the proffered

0315

EAC 02 247 52656
Page 8

position. However, this advertisement postdates the filing of the petition. What's more, this advertisement just stated a preference ("degree preferred"), not a requirement for a degree, and it did not specify any particular major or area of concentration. It is also noted that the bottom section of one of the *Boston Globe* billing documents contains a copy of a four-line advertisement that appears to predate the filing of the petition. This advertisement identifies the open position only as "management," provides a fax reply number, and states "McDonald's looking for mgr." The relevant aspects of both the newspaper and the Internet advertisements are that, first, they did not require candidates to possess at least a bachelor's degree, and, second, they did not limit the petitioner's degree preference to a specific specialty closely related to food service management duties. Going on record without supporting documentary evidence is not sufficient for purposes of meeting the burden of proof in these proceedings. *Matter of Treasure Craft of California*, 14 I&N Dec. 190 (Reg. Comm. 1972).

Finally, the duties of the offered position are not so specialized and complex that knowledge required to perform them is usually associated with the attainment of a baccalaureate or higher degree. The listed duties are similar to those listed in the *Handbook*, and appear to be common in the industry among similar organizations. The fact that the petitioner's franchisor has stringent reporting requirements, or that the petitioner's business is a high volume business, does not render the duties of the position so specialized or complex that a bachelor's level education is required to perform them. Indeed, the *Handbook* states the contrary. *Handbook* at 56-57.

The petitioner has failed to establish that any of the four factors enumerated above are present in this proceeding. It is, therefore, concluded that the petitioner has not demonstrated that the offered position is a specialty occupation within the meaning of the regulations.

Under CIS regulations, the approval of an H-1B petition may be revoked on notice under five specific circumstances. 8 C.F.R. § 214.2(h)(11)(iii)(A). To properly revoke the approval of a petition, the director must issue a notice of intent to revoke that contains a detailed statement of the grounds for the revocation and the time period allowed for rebuttal. 8 C.F.R. § 214.2(h)(11)(iii)(B). In the present matter, the director provided a detailed statement of the grounds for the revocation but did not cite to the specific provision of the regulations as a basis for the revocation. Referring to two of the eligibility criteria at 8 C.F.R. § 214.2(h)(4)(iii), the director reviewed the rebuttal evidence and concluded that the petitioner had not established that the position of food service manager "normally requires at least a baccalaureate degree or that the duties of this particular position are especially complex or unique." Upon review, the director revoked the approval on the basis of 8 C.F.R. § 214.2(h)(11)(iii)(A)(5): "The approval of the petition violated paragraph (h) of this section or involved gross error." The director clearly articulated how the erroneous approval of the petition "violated paragraph (h)" of the regulations and the AAO concurs with the director's findings.

Because the director articulated how the erroneous approval violated paragraph (h) of the regulations, the AAO does not need to reach the conclusion that the approval involved gross error. However, it is noted that the erroneous approval also constitutes gross error and would have been a sufficient basis for revocation.

The term "gross error" is not defined by the regulations or statute. Furthermore, although the term has a juristic ring to it, "gross error" is not a commonly used legal term and has no basis in jurisprudence. *See*

0316

EAC 02 247 52656
Page 9

*Black's Law Dictionary* 562, 710 (7th Ed. 1999)(defining the types of legal "error" and legal terms using "gross" without citing "gross error"). The word "gross" is commonly defined first as "unmitigated in any way: UTTER," as in "gross negligence." *Webster's II New College Dictionary* 491 (2001).

As the term "gross error" was created by regulation, it is most instructive to examine the comments that accompanied the publication of the rule in the Federal Register. The term "gross error" was first used in the regulations relating to the revocation of a nonimmigrant intracompany transferee (L-1) petition. In the 1986 proposed rule, an L-1 revocation would be permitted if the approval had been "improvidently granted." 51 Fed. Reg. 18591, 18598 (May 21, 1986)(Proposed Rule). After receiving comments that expressed concern that the phrase "improvidently granted" might be given a broader interpretation than intended, the agency changed the final rule to use the phrase "gross error." 52 Fed. Reg. 5738, 5749 (Feb. 26, 1987)(Final Rule). As an example of gross error in the L-1 context, the drafter of the regulation stated:

> This provision was intended to correct situations where there was gross error in approval of the petition. For example, after a petition has been approved, it may later be determined that a qualifying relationship did not exist between the United States and the foreign entity which employed the beneficiary abroad.

*Id.* In the context of the L-1 nonimmigrant classification, the phrase "qualifying relationship" is a fundamental requirement for visa eligibility and is defined by the regulation. *See* 8 C.F.R. § 214.2(l)(1)(ii)(G). However, this element of eligibility is not a simple determination or one where there is always a clear answer. To determine whether a qualifying relationship exists between the United States and foreign entities, CIS must examine the elements of "ownership and control" by reviewing corporate stock certificates, a stock certificate registry or ledger, corporate bylaws, the minutes of relevant annual shareholder meetings, proxy agreements, and other documentation. *See Matter of Church Scientology International*, 19 I&N Dec. 593 (BIA 1988); *see also Matter of Siemens Medical Systems, Inc.*, 19 I&N Dec. 362 (BIA 1986); *Matter of Hughes*, 18 I&N Dec. 289 (Comm. 1982). As authorized by Congress, CIS is charged with the authority to make this determination based on the implementing regulations. *See generally,* section 214 of the Act, 8 U.S.C. § 1184.

Accordingly, upon review of the regulatory history and the common usage of the term, the AAO interprets the term "gross error" to be an unmitigated or absolute error, such as an approval that was granted contrary to the requirements stated in the statute or regulations. Regardless of whether there can be debate as to the legal determination of eligibility or whether there is a "clear answer," any approval that CIS determines to have been approved contrary to law *is* an unmitigated error. This view of "gross error" is consistent with the example provided in the Federal Register and with the controlling H-1B regulation, which specifically puts a violation of the regulations on par with "gross error." Again, the regulation at 8 C.F.R. § 214.2(h)(11)(iii)(A)(*5*) specifically states: "The approval of the petition violated paragraph (h) of this section *or* involved gross error." (Emphasis added.)

Stepping back from the minutiae of the regulatory requirements, it warrants noting that Congress intended this visa classification for aliens that are to be employed in an occupation that requires the theoretical and practical application of a body of highly specialized knowledge. Congress specifically stated that such an

0317

EAC 02 247 52656
Page 10

occupation would require, as a minimum qualification, a baccalaureate or higher degree in the specialty. CIS regularly approves H-1B petitions for qualified aliens who are to be employed as engineers, computer scientists, certified public accountants, college professors, and other such professions. These occupations all require a baccalaureate degree in the specialty as a minimum for entry into the occupation and fairly represent the types of professions that Congress contemplated when it created that visa category. In the present matter, the petitioner has offered the beneficiary a position as "food service manager" in a fast food restaurant. Although the AAO can believe that the position requires highly specialized knowledge relating to proprietary knowledge of the petitioner's franchise operations, as demonstrated by the beneficiary's completion of McDonald's Floor Managers Course, McDonald's Basic Operations Course, and McDonald's Advanced Operations Course at McDonald's "Hamburger University" in Chicago, this is not the type of knowledge that would normally be derived from a baccalaureate degree of food service manager, and is not the type contemplated by Congress when it wrote the law. On its face, the approval of a "food service manager" as an H-1B specialty occupation would be grossly erroneous and contrary to the intent of Congress.

For the reasons discussed above, the AAO concurs with the service center director's findings and it affirms the previous decision of the AAO to dismiss the appeal.[1]

---

[1] It should be noted that the record as it relates to the beneficiary's qualifications includes a letter from the petitioner, dated July 19, 2002, and an education-equivalency evaluation which both characterized the beneficiary's history with McDonald's Corporation USA as work experience. The beneficiary stated on his resume, "[f]rom September 2000 to present, I [have] work[ed] in McDonald's Corporation USA, like [sic] store manager in Westboro McDonald's restaurant, Westboro, Massachusetts." The beneficiary is currently in the United States as the beneficiary of an approved H-3 nonimmigrant trainee visa petition (LIN 02 194 53972), which was filed by McDonald's Corporation USA. The H-3 visa is valid only for training that does not place the beneficiary in a position which is in the normal operation of the U.S. petitioner's business, is not a position in which U.S. citizens and resident workers are regularly employed, and is not productive employment. 8 C.F.R. § 214.2(h)(7)(ii)(A). While the AAO does not have the record of proceeding for the approved H-3 nonimmigrant petition, based on information contained within this record it appears that the beneficiary has been engaged in productive employment instead of training while in the United States under the approved H-3 nonimmigrant visa. This employment would be grounds for revocation of approval of the H-3 petition under 8 C.F.R. §§214.2(h)(11)(iii)(A)(3) and (4), and, should the director choose, is sufficient cause for CIS to reexamine the McDonald's Corporation USA H-3 training program.

The petitioner also submitted a June 6, 2002 letter signed by Jane Robertson, the beneficiary's Area Supervisor while he has been an H-3 nonimmigrant trainee for McDonald's Corporation USA. Ms. Robertson further confirms that the beneficiary's history with McDonald's Corporation USA has been productive employment. She confirms that the beneficiary has been "working in various restaurants," and that effective September 2001, the beneficiary has been restaurant manager of the Westboro 2 location. In this capacity, he has been "responsible for all areas of operation," such as "people, products, equipment and profitability." Although it appears that the beneficiary received some training in "preparing profit and loss statements, inventory control, scheduling process[es], payroll and all aspects of running the restaurant," the beneficiary "was responsible for the same areas in his country so he learned very easily." An H-3 nonimmigrant trainee visa petition is valid only for training that is not available in the alien's own country.

EAC 02 247 52656
Page 11


As always, the burden of proof in these proceedings rests solely with the petitioner. Section 291 of the Act, 8 U.S.C. 1361. The petitioner has not met that burden.

**ORDER:** The decision of the AAO is affirmed. The approval of the petition is revoked.

---

8 C.F.R. § 214.2(h)(7)(ii)(A)(*1*). To the extent that his limited training with McDonald's Corporation USA mirrors his training and experience "in the same areas" with McDonald's while overseas, it does not appear that the McDonald's Corporation USA training program is valid for purposes of approval of an H-3 nonimmigrant trainee visa petition. This would be an additional ground for revocation of approval of the H-3 petition under 8 C.F.R. §§ 214.2(h)(11)(iii)(A)(*3*) and (*4*).