SCANNED

DATE: 7-20-04

BY: [signature]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE MD MANAGEMENT CO., LLC, ) | |
| Petitioner, ) | |
| ) | |
| ADRIAN LEPEDEANU, ) | |
| Beneficiary, ) | |
| ) | |
| MARIANA LEPEDEANU, ) | |
| Dependent, Spouse, ) | |
| ) | |
| R.L,. ) | |
| Dependent, Child, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 04-10499-RWZ |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY, CITIZENSHIP AND ) | |
| IMMIGRATION SERVICES, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S MEMORANDUM
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, United States Department of Homeland Security ("DHS"), hereby submits

this Memorandum in Support of its Motion For Summary Judgment. As set forth below,

plaintiffs' challenge to defendant's discretionary decision to revoke the nonimmigrant worker

petition of Adrian Lepedeanu is not subject to judicial review. Even if such decision was subject

to judicial review, the deferential "arbitrary and capricious" standard of the Administrative

Procedure Act ("APA") applies, and compels a decision accepting the revocation by the agency.

### Statement of Undisputed Facts[1]

1. Plaintiff MD Management Co. LLC operates two McDonald's restaurant franchises in Boston. Administrative Record ("Rec.") 0003, ¶ 2. It has 95 employees and a gross annual income of $2,462,954. Id. It seeks to employ Adrian Lepedeanu, a Romanian citizen, as a "Food Service Manager." Id. Plaintiffs assert that this Food Service Manager position qualifies as a "specialty occupation" within the meaning of 8 U.S.C. §1184 and regulations promulgated thereunder, and that Mr. Lepedeanu is therefore entitled to an H-1B visa. Id. ¶ 5.

2. On or about July 24, 2002, plaintiffs' I-129 Petition for Nonimmigrant Worker to Defendant was filed with DHS (specifically, its Premium Processing Unit of the Vermont Service Center). Rec. 0212 ¶ 1. That I-129 Petition detailed Mr. Lepedeanu's Food Service Manager responsibilities as follows:

> Our company is exploring expansion through the acquisition of additional franchises. We are in need of the services of a Food Service Manager to coordinate the food service activities at each of our Boston, MA restaurants. This manager will report directly to [the owner/CEO] . . . . [Mr. Lepedeanu] will be responsible for supervising other shift managers, production managers, service mangers and staff and have the following duties:
>
> 1. Responsible for all operations and functions of the franchise;
> 2. Estimate food and beverage costs, requisition and purchase product and supplies;
> 3. Direct hiring, firing and assignment of personnel;
> 4. Responsible for all training of personnel to maintain consistent level of quality and service
> 5. Investigate and resolve food quality and service complaints
> 6. Review financial transactions and monitor budget to ensure efficient operation, and to ensure expenditures stay within budgetary limitations.

---

[1] These facts are taken from the Administrative Record, which has been filed with the Court.

2

Rec. 0225 ¶ 3 - Rec. 0226 ¶ 1.

3. The U.S. Department of Labor's <u>Occupational Outlook Handbook</u>, 2002-03 edition, at

55-56, details the duties of a Food Service Manager as follows:

> The daily responsibilities of many food service managers can often be as
> complicated as some of the meals prepared by a fine chef. In addition to the
> traditional duties of selecting and pricing menu items, using food and other
> supplies efficiently, and achieving quality in food preparation and service,
> managers now are responsible for a growing number of administrative and human
> resource tasks. For example, managers must carefully find and evaluate new ways
> of recruiting employees in a tight job market. Once hired, managers also must
> find creative ways to retain experienced workers.
> . . . .
> On a daily basis, managers estimate food consumption, place orders with
> suppliers, and schedule the delivery of fresh food and beverages. They receive
> and check the content of deliveries, evaluating the quality of meats, poultry, fish,
> fruits, vegetables and baked goods. To ensure good service, managers meet with
> sales representatives from restaurant suppliers to place orders replenishing stocks
> of tableware, linens, paper, cleaning supplies, cooking utensils, and furniture and
> fixtures. They also arrange for equipment maintenance and repairs, and
> coordinate a variety of services such as waste removal and pest control.
>
> The quality of food dishes and service in restaurants depends largely on a
> manager's ability to interview, hire, and when necessary, fire employees. This is
> especially true in tight labor markets, when many managers report difficulty in
> hiring experienced food and beverage preparation and service workers. . . . Once a
> new employee is hired, managers explain the establishment's policies and
> practices and oversee any necessary training. Managers also schedule the work
> hours of employees, making sure there are enough workers present to cover peak
> dining periods. If employees are unable to work, managers may have to fill in for
> them. Some managers regularly help with cooking, clearing of tables, or other
> tasks. . . . They also investigate and resolve customer's complaints about food
> quality or service. . . .
> In addition to their regular duties, food service managers have a variety of
> administrative responsibilities. Although much of this work is delegated to a
> bookkeeper in a larger establishment, managers in most smaller establishments,
> such as fast-food restaurants, must keep records of the hours and ages of
> employees, prepare the payroll, and fill out paperwork in compliance with
> licensing laws and reporting requirements of tax, wage and hour, unemployment
> compensation, and Social Security laws. Managers also maintain records of
> supply and equipment purchases and ensure that accounts with suppliers are paid

on a regular basis. . . .

. . . .

At the conclusion of each day, or sometimes each shift, managers tally the cash and charge receipts received and balance them against the record of sales. In most cases, they are responsible for depositing the day's receipts at the bank or securing them in a safe place. . . .

Rec. 0007 ¶ 1 - Rec. 0008 ¶ 2.

4. The Handbook notes that Food Service Managers are recruited from 2 and 4 year college hospitality management programs, as well as from technical institutes and other institutions offering programs leading to associate degrees or other formal certification. Rec. 0008 ¶ 4.

5. Subsequent to the filing of the I-129 Petition, Defendant requested additional information, namely evidence that a baccalaureate degree in a specific field of study is a standard minimum requirement for the offered position at MD Management or generally in the industry, and that MD Management normally employs individuals with a baccalaureate degree in a specific field of study for this position. Rec. 0005 ¶ 1.

6. In response, MD Management provided two opinions. One was from Nicholas J. Hadgis, Dean of the School of Hospitality Management at Widener University, and is dated August 20, 2002. Rec. 0191. He opined that the position in question requires a baccalaureate degree and industry training and experience. Rec. 0192 ¶ 1. The other was from John Stefanelli, Professor and Chair, of the Department of Food and Beverage Management, William F. Harrah College of Hotel Administration, and is dated August 19, 2002. Rec. 0194. He stated that it is the *preference* of McDonald's, as well as other similarly situated food service companies, to hire food service managers with baccalaureate level education. Rec. 0196 ¶ 3 (emphasis supplied).

4

7. MD Management also provided information that in the past the food service manager position had been held by its CEO, who has a bachelor's degree in an unspecified field, and by his wife, who has an associate's degree in an unspecified field. Rec. 0189.

8. On September 6, 2002, the I-129 Petition was approved. Rec. 0005 ¶ 4.

9. On September 20, 2002, Defendant issued a Notice of Intent to Revoke ("NOIR"), noting that the subject position did not appear to qualify as a specialty occupation. The letter further stated that the wife of the CEO did not appear to have a baccalaureate degree, or its equivalent. Petitioner was given 30 days to present evidence to overcome the revocation. Rec. 0015 ¶ 3.

10. MD Management did present additional material, including copies of reports that the food service manager would be required to complete to establish franchise compliance with McDonald's Corporation standards: a Full Operations Review; Rec. 0045 - Rec. 0079; financial statements; Rec. 0080 - Rec. 0081; a monthly profit and loss report; Rec. 0082; a daily store report; Rec. 0083 - Rec. 0084; a transaction detail report; Rec. 0085; a sales ledger; Rec. 0086; an inventory reorder report; Rec. 0087; a supervisor audit worksheet; Rec. 0088; a product mix report; Rec. 0089; an inventory stat report; Rec. 0090; a QCR optimum food cost report; Rec. 0091; a raw waste report; Rec. 0092 - Rec. 0093; and a labor analysis report. Rec. 0094 - Rec. 0096.

11. MD Management also submitted supplemental opinion letters from Professors Hadgis and Stefanelli. In a letter dated October 4, 2002, Professor Hadgis reiterated his opinion that anyone with less than a baccalaureate degree would not be qualified for the Food Service Manager position. Rec. 0039 ¶ 2. However, in a letter dated October 10, 2002, Professor

5

Stefanelli qualified his original statement, stating that while a 4-year degree is preferred, McDonald's and other similarly situated companies often have to "under-hire," due to labor market conditions. Rec. 0043 ¶ 5. In addition, MD Management submitted internal documents regarding three previous employees who had been in the proffered position, each document stating that the employees had earned a baccalaureate degree in an unspecified field. Rec. 0034 - Rec. 0036. MD Management also submitted Mrs. Yee's resume, which states that she has over 37 years of experience in hospitality/food service fields. Rec. 0030.

12. On December 23, 2002, the agency revoked approval of Mr. Lepedeanu's nonimmigrant petition. Rec. 0003 ¶ 1.

13. Plaintiffs timely appealed. Rec. 0011.

14. On January 6, 2004, the agency's Administrative Appeals Office ("AAO") upheld the revocation. Rec. 0003 ¶ 1. In particular, the AAO found that Plaintiffs did not establish the primary "specialty occupation" requirement that a baccalaureate or higher degree, or its equivalent, is normally the minimum for entry into the food service manager position. Rec. 0008 ¶ 4. In addition the AAO found that Plaintiffs did not establish any of the other "specialty occupation" criteria. Rec. 0009 ¶ 2.

15. On June 25, 2004, the agency reissued its revocation decision, reaching the same conclusion, and clarifying the bases for that decision. Rec. 0309-0319. In reiterating its finding that the plaintiffs had not established any of the "specialty occupation criteria, the agency noted that while MD Management is a multi-million dollar business, the duties of the proffered position are consistent with those listed for a food service manager in the Occupational Outlook Handbook, Rec. 0316, which has long been recognized by the agency as an authoritative source

6

on the duties and educational requirements of many occupations, Rec. 0314. The <u>Handbook</u> specifically states that many companies hire food service managers without baccalaureate degrees. Rec. 0316. The agency also noted that this conclusion was consistent with the opinion of plaintiff's expert, Professor Stefanelli, who opined that many companies hire food service managers who do not have a baccalaureate degree. <u>Id</u>.

### Argument

1.      <u>This Court Lacks Jurisdiction Over This Dispute</u>.

The Supreme Court has declared that Congressional authority to "prescribe the terms and conditions upon which [aliens] may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications." <u>Kleindienst v. Mandel</u>, 408 U.S. 753, 766 (1972). <u>See also</u> <u>INS v. Aguirre-Aguirre</u>, 526 U.S. 415, 425 (1999) ("Judicial deference to the Executive Branch is especially appropriate in the immigration context. . ."). While these cases did not address the specific jurisdictional question at issue in the present case, these cases demonstrate that generally the judiciary must defer to executive authority in the immigration context.

In this case, the specific statutes and regulations at issue preclude the exercise of jurisdiction. Both the text of 8 U.S.C. §1252(a)(2)(B)(ii) and recent case law interpreting it, provide that DHS' decision to revoke Lepedeanu's H-1B status is a discretionary determination not subject to judicial review. Title 8 U.S.C. §1252(a)(2)(B)(ii) provides:

> Notwithstanding any other provision of law, no court shall have jurisdiction to review . . . any . . . decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General, other than the granting of [asylum].

7

Sections 1151 through 1378 of Title 8 of the United States Code constitute "this subchapter," referred to in 8 U.S.C. §1252(a)(2)(B)(ii). Plainly, the section regarding nonimmigrant petitions, §1184, at issue here, is included in those for which there is no judicial review.

The discretionary nature of the revocation decision in this case is underscored by the parameters of 8 U.S.C. § 1184(a)(1), which provides that "the admission . . . of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General by regulations may prescribe." In addition, the regulations provide that, as to the nonimmigrant visa petitions at issue here, Defendant "may revoke a petition at any time. . . ." 8 C.F.R. §214.2(h)(11)(ii)(B). The use of the term "may" in the statute indicates that the Attorney General has discretion over the revocation of previously approved petitions. See International Union v. Dole, 919 F.2d 753, 756 (D.C. Cir. 1990); Ramey v. Block, 738 F.2d 756, 760 (6th Cir. 1984) (use of the word "may" strongly suggests that Congress intended that the Secretary's action be discretionary).

To dispel any doubt as to the broad reach of 8 U.S.C. §1252(a)(2)(B)(ii), on April 29, 2004, the Seventh Circuit expressly held that its scope encompasses "any discretionary decisions of the Attorney General made under the authority of sections 1151 through 1378 of title 8 of the United States Code. . . ." El-Khader v. Monica, 366 F.3d 562, 566 (7th Cir. 2004). Like the instant case, Monica involved a decision to revoke a previously approved visa petition. Id. at 565. In a case also involving an H-1B visa, and hence also involving 8 U.S.C. §1184, the Sixth Circuit also held that denial of the extension of a non-immigrant visa was a matter within the discretion of the Attorney General and therefore not subject to judicial review. CDI Information Servs., Inc. v. Reno, 278 F.3d 616, 620 (6th Cir. 2002).

In addition to the Sixth and Seventh Circuits, the Tenth Circuit has also concluded that revocations of approved immigrant visa petitions (as opposed to a nonimmigrant visa petition, like the one at issue here) are discretionary and thus not subject to judicial review. Van Dinh v. Reno, 197 F.3d 427, 434 (10th Cir. 1999). See also, Maine State Building and Construction Trades Council AFL CIO v. Chao, 265 F.Supp.2d 105 (D.Me. 2003)(court lacked jurisdiction to review INS action on non-immigrant visa applications); aff'd on other grounds, 359 F.3d 14 (1st Cir. 2004); Systronics Corp. v. Immigration and Naturalization Service, 153 F.Supp.2d 7, 11-12 (D.D.C. 2001)(revocation of immigrant visa for multinational executive manager precluded from judicial review).

However, some courts have held there is jurisdiction in §1184 claims. See Evangelical Lutheran Church in America v. Immigration and Naturalization Service, 288 F.Supp.2d 32 (D.D.C. 2003); Calexico Warehouse, Inc. v. Neufeld, 259 F.Supp.2d 1067 (S.D. Cal. 2002); Shanti, Inc. v. Reno, 36 F.Supp.2d 1151 (D. Minn. 1999). These courts reasoned that because §1252 is entitled, "Judicial Review of Orders of Removal," the jurisdiction stripping provisions only apply to orders of removal, not issues like the denial of an H-1B nonimmigrant visa. E.g. Shanti, 36 F.Supp.2d at 1158.

This reasoning has only surface appeal, and thorough analysis demonstrates significant flaws in the reasoning of those courts. First, the Supreme Court has held that little weight is to be accorded to statutory headings and titles:

> Where text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner. . . . For interpretive purposes, they are of use *only* when they shed light on some ambiguous word or phrase. *They are but tools available for the resolution of doubt.*

9

Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad, 331 U.S. 519, 528-529 (1947) (emphasis supplied).

Further, the text at issue in the present case is hardly ambiguous. As discussed above, §1252(a)(2)(B)(ii) clearly states that it applies to subchapter II of Chapter 12 of Title 8, which contains sections 1151 through 1378. Thus there is no need to look to the title of §1252 for clarity -- there is simply no doubt in need of resolution. In fact, it was for this very reason that the Sixth and Seventh Circuits found there was no jurisdiction over plaintiff's appeal in the §1184 context. See Monica, 366 F.3d at 563; CDI Information Services, 278 F.3d at 619-620.

Plaintiffs will likely rely on Tapis International v. INS, 94 F.Supp.2d 172 (D. Mass. 2000), as support for their argument that this Court may exercise jurisdiction over an H-1B appeal. In that case, the district court (Tauro, J.) did engage in a review, pursuant to the APA, of the agency's denial of the renewal of a non-immigrant visa. However, Tapis does not address the jurisdictional issue because neither of the parties briefed it. Thus, Tapis can hardly be seen as precedent that there is jurisdiction in this Court over plaintiff's claim. Furthermore, since the Tapis decision, a number of decisions, including those cited herein, have explicitly considered the jurisdictional issues raised generally by 8 U.S.C. §1252(a)(2)(B)(ii) and specifically by 8 U.S.C. §1184. The reasoning of these courts, particularly the Sixth and Seventh Circuits, who have rejected jurisdiction, is compelling.

Moreover, while the First Circuit has not had occasion to consider the §1184 jurisdictional issue in the present case, it has held that discretionary decisions, in the immigration habeas context, are not reviewable. Carranza v. INS, 277 F.3d 65, 72 (1st Cir. 2002). Notably, the Seventh Circuit in Monica cited to a prior case applying §1252(a)(2)(B)(ii) to the habeas

10

context, stating that the case was precedent that §1252(a)(2)(B)(ii) applies to more than just removal proceedings. Monica, 366 F.3d at 566 (citing Samirah v. O'Connell, 335 F.3d 545 (7th Cir. 2003), "§1252(a)(2)(B)(ii) is not limited to discretionary decisions made within the context of removal proceedings").

Therefore, Defendant urges this Court to dismiss this case for lack of jurisdiction.

2. Even If This Court Has Jurisdiction, It Must Defer To The Agency Decision.

A. The summary judgment standard and legal framework for H-1B visas.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ P. 56(c). A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995), cert. denied, 515 U.S. 1103. Once the movant has made such a showing, it is up to the non-movant to point to specific facts demonstrating that there exists a trialworthy issue. Id. An issue is genuine if there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of truth at trial." Hahn v. Sargent, 523 F. 2d 461, 464 (1st Cir. 1975), quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253 289 (1968). A fact is material if it "affects the outcome of the litigation." Pignons S.A. de Mecanique v. Polaroid Corp., 657 F.2d 482, 486 (1st Cir. 1981). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

The particular status at issue in the present case, popularly known as "H-1B," is found in

8 U.S.C. §1101(a)(15)(H)(i)(B), which provides, in pertinent part, for the classification of

qualified nonimmigrant aliens who are coming temporarily to the United States to perform

services in a specialty occupation.

The term "specialty occupation" is defined by 8 U.S.C. §1184(i)(1) as an occupation that

requires:

> (A) theoretical and practical application of a body of highly specialized knowledge, and
> (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)
> as a minimum for entry into the occupation in the United States.

To qualify as a specialty occupation, the position must meet one of the following criteria:

> 1. A baccalaureate or higher degree or its equivalent is normally the minimum
> requirement for entry into the particular position;
> 2. The degree requirement is common to the industry in parallel positions among similar
> organizations or, in the alternative, an employer may show that its particular position is so
> complex or unique that it can be performed only by an individual with a degree;
> 3. The employer normally requires a degree or its equivalent for the position; or
> 4. The nature of the specific duties is so specialized and complex that knowledge
> required to perform the duties is usually associated with the attainment of a baccalaureate
> or higher degree.
> 8 C.F.R. §214.2(h)(4)(iii)(A).

Defendant has discretion to revoke previously approved petitions in this category,

pursuant to 8 C.F.R. §214.2(h)(11)(ii)(B), which provides that "[Defendant] may revoke a

petition at any time. . . ."

### B. On the merits, the agency revocation was not "arbitrary and capricious."

If this Court determines that it does have jurisdiction over the revocation of approved

nonimmigrant visa petitions, the APA governs that review. Under the APA, the agency's

decision may only be reversed if it is "arbitrary, capricious, or an abuse of discretion or otherwise

12

not in accordance with the law." 5 U.S.C. §706(2)(A); Augat, Inc. v. Tabor, 719 F. Supp. 1158,
1160 (D. Mass. 1989).

The Court's "function when reviewing an agency decision is limited to determining
whether the evidence in the administrative record is sufficient to support the conclusion the
agency reached." Augat, 719 F. Supp. at 1160. An abuse of discretion takes place where the
decision is not supported by substantial evidence or where the determination relies on an
improper understanding of the law. Id. As set forth below, neither is present here.

The APA standard presumes the validity of agency action. Avena v. INS, 989 F. Supp. 1,
4 (D.D.C. 1997). Moreover, court review for arbitrary and capricious conduct is extremely
deferential, particularly where, as here, the agency is interpreting a statute which Congress has
specifically entrusted to it and where it has special expertise, or where an agency is interpreting
its own regulations. Id. See also De Los Santos v. INS, 690 F.2d 56, 60 (2d Cir. 1982)(where
"the INS's strict interpretation is consistent with the language and history of the Immigration and
Nationality Act and is, as a general matter, reasonably calculated to serve the purposes of the Act,
it is entitled to deference and should not be invalidated"). "[C]ourts have refused to overrule
agency interpretations of statutory authority in the area of immigration absent an affirmative
showing that the interpretation is unreasonable or contrary to legislative intent." Yuk-Ling Wu
Jew v. Attorney General, 524 F.Supp. 1258, 1260 (D.D.C. 1981).

### 1. The agency's decision is adequately supported.

The agency decision revoking the nonimmigrant visa petition was neither clearly
erroneous nor inconsistent with the regulations. It is noteworthy that in the agency proceedings
Plaintiffs bore the burden of proof. 8 U.S.C. § 1361. The agency concluded that Plaintiffs had

13

not met any of the regulatory requirements under 8 C.F.R. § 214.2(h)(4)(iii)(A) to qualify the

"food service manager" position as a "specialty occupation."

As noted, Plaintiffs failed to establish any of the four requirements set forth in 8 C.F.R.

§214.2(h)(4)(iii)(A) with respect to the "food service manager" position:

> 1. A baccalaureate or higher degree or its equivalent is normally the minimum
> requirement for entry into the particular position;
> 2. The degree requirement is common to the industry in parallel positions among similar
> organizations or, in the alternative, an employer may show that its particular position is so
> complex or unique that it can be performed only by an individual with a degree;
> 3. The employer normally requires a degree or its equivalent for the position; or
> 4. The nature of the specific duties is so specialized and complex that knowledge
> required to perform the duties is usually associated with the attainment of a baccalaureate
> or higher degree.

With respect to 8 C.F.R. §214.2(h)(4)(iii)(A)(1), there is insufficient evidence in the

record to establish that a baccalaureate or higher degree or its equivalent is normally the

minimum requirement for entry into the position of "food service manager." The agency

decision is supported by the U.S. Department of Labor's Occupational Outlook Handbook, which

states that food service managers are often "recruited from two and four year college hospitality

management programs, as well as from technical institutes and other institutions." Rec. 0008 ¶4.

The decision is also consistent with the opinion offered by plaintiffs' expert John Stefanelli,

wherein he acknowledged that many companies prefer food service managers with baccalaureate

level education, yet many hire individuals with lesser levels of education and then provide

additional education, training and/or experience.

Similarly, Mrs. Yee, who along with her husband most recently performed the position of

food service manager, only possesses an associate degree. While, in certain cases, one may

demonstrate the equivalency of a baccalaureate degree through a combination of education,

14

specialized training and/or work experience, the agency reasonably concluded that Mrs. Yee,

despite her work experience, does not possess the equivalent of a baccalaureate degree.  The

agency's regulations at 8 C.F.R. § 214.2(h)(4)(iii)(D) address the criteria necessary for

establishing the equivalency of a baccalaureate degree, proving that it may calculate three years

of relevant experience for each year toward a baccalaureate degree.  8 C.F.R. §

214.2(h)(4)(iii)(D)(5).  However, the experience must also be supplemented by any of five

criteria:

> (i) Recognition of expertise in the specialty occupation by at least two recognized
> authorities in the same specialty occupation;
> (ii) Membership in a recognized foreign or United States association or society in the
> specialty occupation;
> (iii) Published material by or about the alien in professional publications, trade journals,
> books or major newspapers;
> (iv) Licensure or registration to practice the specialty occupation in a foreign country; or
> (v) Achievements which a recognized authority has determined to be significant
> contributions to the field of the specialty occupation.

8 C.F.R. § 214.2(h)(4)(iii)(D)(5)(i)-(v).  While Mrs. Yee's resume demonstrates that she has been

a food manager for several years, there is no evidence in the record to establish that the position

she held, and which Mr. Lepedeanu holds requires a baccalaureate degree or its equivalent.  The

agency clearly informed plaintiffs that the fact that Mrs. Yee did not have a baccalaureate degree

or its equivalent was a reason that Lepedeanu's visa had been revoked.  Accordingly, plaintiffs

were given ample opportunity to demonstrate that she has the equivalent of a baccalaureate

degree.  As a result of plaintiffs' failure to provide any evidence to satisfy the agency that Mrs.

Yee met the criteria set forth in 8 C.F.R. §214.2(h)(4)(iii)(D)(5), the agency had no basis upon

which to find that Mrs. Yee had achieved the equivalent of a baccalaureate degree.

    The agency also properly found that plaintiffs failed to establish any of the other three

elements set forth in 8 C.F.R. §214.2(h)(4)(iii)(A) necessary to demonstrate that Mr.

Lepedeanu's food service manager position qualifies as a specialty occupation. First, plaintiffs

failed to establish that a degree requirement was common to the industry in parallel positions

among similar organizations, or alternatively, that the position is so complex or unique that it can

be performed only by an individual with a degree. While plaintiffs' expert Nicholas Hadgis

opined in his letter dated August 20, 2002 that the position of Food Service Manager requires a

baccalaureate degree along with industry training and experience, this opinion is inconsistent

with the Handbook and expert John Stefanelli's letter dated October 10, 2002, both of which

state that companies regularly hire food service managers from 2-year programs. There is

nothing in the record to suggest that the agency should have accepted Hadgis' opinion to the

exclusion of the other contradictory evidence.

Second, plaintiffs did not establish that M.D. Management normally requires a degree in

a specific specialty or its equivalent for the position. The position for which Lepedeanu has

applied was most recently filled by David Yee and his wife. However, there is no evidence as to

the field in which David Yee received his baccalaureate degree, and thus no evidence that a

degree in a specific field is required for the position. Furthermore, Mrs. Yee only received an

associate degree. In addition, although MD Management submitted internal documentation of

previous managers stating they had achieved a baccalaureate degree, these documents were not

corroborated by any evidence of that educational background. Clearly the mere statement in an

employee folder that the employee has a baccalaureate degree is not sufficient to establish that

the employee had a baccalaureate degree in a specific related specialty, or that such a degree was

the minimum requirement for the "food service manager" position.

16

Even if the petitioner had established that they Yees posses baccalaureate degrees in specific specialties, the agency must examine the ultimate employment of the alien, and determine wither the position qualifies as a specialty occupation, regardless of the petitioner's past hiring practices. Cf. Defensor v. Meissner, 201 F.3d 384 (5th Cir. 2000). In Defensor, the Fifth Circuit observed, in dicta, that the four criteria of 8 C.F.R. §214.(h)(4)(iii)(A) present certain ambiguities when compared to the statutory definition, and "might also be read as merely an additional requirement that a position must meet, in addition to the statutory and regulatory definition." Id. at 387. The critical element is not the title of the position or an employer's self-imposed standards, but whether the position actually requires the theoretical and practical application of a body of highly specialized knowledge, and the attainment of a baccalaureate or higher degree in the specific specialty as the minimum entry into the occupation as required. In this regard, plaintiffs failed to establish that the McDonald's Food Service Manager position entails the theoretical and practical application of a body of highly specialized knowledge as required by statute. Because the petition was approved contrary to the requirements of the statute and the regulations, the agency found that the approval of the petition constituted gross error and accordingly revoked the petition. 8 C.F.R. §214.2(h)(11)(iii)(A); Rec. 0316-0318.

Finally, Plaintiffs did not establish that the duties of a Food Service Manager in their fast-food franchise are so specialized and complex that the knowledge required to perform them is usually associated with the attainment of a baccalaureate or higher degree. Defendant acknowledges that MD Management operates a high-volume business, but nonetheless the duties listed are consistent with those outlined in the Handbook, and are not so specialized or complex that the knowledge required to perform them is usually associated with attainment of a

17

baccalaureate or higher degree. The fact that companies often hire graduates of 2-year programs provides further support for the agency's conclusion.

### 2. Relevant case law supports upholding the agency decision.

The agency's decision is consistent with <u>Tapis</u> in that it specifically addressed the baccalaureate "or its equivalent" language of 8 C.F.R. §214.2(h)(4)(iii)(A). In <u>Tapis</u>, the court found that the INS' denial of a visa was arbitrary and capricious because the INS had failed to take into account the evidence presented by petitioners that established the equivalency element of the educational requirement. 94 F. Supp.2d at 176. However in this case, there was no evidence to establish the equivalency element. While Mrs. Yee has several years of field experience, plaintiffs failed to submit any evidence demonstrating that such experience amounted to the equivalent of a baccalaureate degree.

The agency's decision is also supported by <u>Shanti</u>. The court in <u>Shanti</u> did a thorough analysis applying the arbitrary and capricious standard, and ultimately determined that the INS had not abused its discretion when it denied plaintiff's application for an H-1B visa for the alien beneficiary, James, a restaurant manager. 36 F.Supp.2d at 1166. As here, the agency had determined that the position of restaurant manager was not a specialty occupation and that James was not qualified to work in a specialty occupation, as Shanti failed to establish any of the four criteria set out in 8 C.F.R. § 214.2(h)(4)(iii)(C). <u>Id.</u> at 1156-1157.

The restaurant manager position at issue in <u>Shanti</u> is almost identical to the food service manager position at issue in the present case. Like the food service manager, the duties of the restaurant manager include making financial decisions regarding allocation of funds,

18

authorization of expenditures and budgetary planning, as well as recruiting, training and supervising the entire staff and maintaining records of payroll and tax and general business issues. Id. at 1155. Simply put, the restaurant manager, like the food service manager in the present case, was responsible for the routine operations of the restaurant business and reported directly to the owners. While plaintiffs may argue that Shanti is not fully supportive of the agency decision because the restaurant there had a gross annual income of $185,000, as contrasted with the $2.46 million in annual income for M.D. Management's restaurants, this would merely be an attempt to sidestep the clear fact that the *position* and its attendant responsibilities in Shanti are almost identical to the one in the present case. Moreover, the mere fact that Shanti and the present case may be distinguished in some manner is hardly sufficient to overturn the agency's decision to revoke approval of Lepedeanu's nonimmigrant worker petition.

In sum, given the evidence in support of the agency's decision, and the vast deference accorded to the agency, the Court should rule in Defendant's favor.

19

<u>Conclusion</u>

For all the foregoing reasons, Defendant respectfully requests that the Court allow its

motion for summary judgment and enter judgment in its favor.

Respectfully submitted,

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY

By its attorney,

MICHAEL J. SULLIVAN
United States Attorney

By:

Jeremy M. Sternberg
Assistant U.S. Attorney
U. S. Attorney's Office
J. Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3142

<u>Certificate of Service</u>

I certify that I caused a copy of this pleading to be sent by US Mail to Maureen
O'Sullivan, Kaplan, O'Sullivan & Friedman, 10 Winthrop Sq., Boston, MA 02110.

7/19/04

Jeremy M. Sternberg
Assistant U.S. Attorney

20